506 P.2d 824

Gloria BRADDOCK et al., Plaintiffs-
Respondents,

v.

FAMILY FINANCE CORPORATION, an
Idaho corporation, Defendant-
Appellant.

FAMILY FINANCE CORPORATION, an
Idaho corporation, Plaintiff-
Appellant,

v.

Norman MILLER and Marilyn Miller, Hus-
band and Wife, Defendants-Respondents.

No. 10916.

Supreme Court of Idaho.

Feb. 16, 1973.

C. J. Hamilton, Herbert Nagel, Coeur d'Alene, for Family Finance Corp.

James W. Ingalls, Coeur d'Alene, for plaintiffs-respondents and defendants-respondents.

BAKES, Justice.

We are called upon today to determine the validity of notes and security instruments executed as a result of a chain referral sales scheme. This appeal consolidates a suit in which Family Finance brought action to enforce a promissory note and security agreement against a defaulting purchaser with another suit in which Gloria Braddock, and others, sought a declaratory judgment that similar instruments were void and unenforceable as part of an illegal lottery. The district court granted summary judgment in favor of the purchasers on the ground that the instruments had been obtained as a result of a referral sales scheme which constituted an illegal lottery. We reverse the summary judgment entered by the trial court.

In March of 1968 one Larry Sease, doing business as Cen-States Marketing and Research, planned a campaign of door-to-door stereo phonograph sales in the Coeur d'Alene area. Sease approached defendant-appellant Family Finance Corporation (hereinafter Family Finance) to obtain financing for his prospective customers. Family Finance refused to purchase conditional sales contracts resulting from stereo sales. Family Finance did, however, agree to loan money directly to Sease's customers. These loans were evidenced by notes which were secured by the stereo sets and in some cases additional security put up by the purchasers. Family Finance was fully aware of the referral sales scheme planned by Sease to obtain sales of stereo sets.

Under Sease's scheme, the purchaser would automatically become a "representative" of Cen-States when he bought a stereo set. Each "representative" received an "allotment privilege" and a "bonus appointment privilege." Under the "allotment privilege" a "representative" was to be paid $100 for each sales referral which resulted in a sale. The "bonus appointment privilege" promised a "representative" $1,000 if the "representative" supplied Cen-States with 40 bona fide appointments with prospective customers.

The representation and main thrust of this referral sales scheme was that some purchasers would thus obtain their stereo phonographs at a lower cost, or, if they had enough successful referrals, without cost. The "contact instruction" given to "representatives" indicated that the "representatives" were to emphasize the possibility of easy money and refrain from talking about the product in their contacts with other prospective purchasers.

There appears to have been a close operating relationship between Sease and Family Finance during the time Sease was marketing his referral sales plans in the Coeur d'Alene area. Family Finance was fully aware of the referral sales scheme Sease was using to sell his stereo sets and facilitated Sease's sales by permitting Sease to display a sample set in the Family Finance office in Coeur d'Alene, by assuring purchasers on occasion that the stereo sets were worth $700–800, by opening their office evenings and on weekends at the request of Sease to make loans to purchasers, by permitting "representatives" to leave referrals for Sease at their office, and by loaning approximately $50,000 in the Coeur d'Alene area for the purchase of stereo sets from Sease.

Family Finance, plaintiff-appellant in Case Number 23413, brought an action in May, 1968, to enforce a promissory note and security agreement against a defaulting stereo purchaser. In July, 1968, plaintiffs-respondents Gloria Braddock and others (hereinafter purchasers) filed action against Family Finance in Case Number 23457, seeking a declaratory judgment that the notes and security agreements were void and unenforceable as constituting part of an illegal lottery. After the cases had been consolidated for trial, the purchasers sought summary judgment. After hearing, summary judgment was granted against Family Finance on the ground that the referral sales scheme was an illegal lottery in violation of Article 3, Section 20, of the Idaho Constitution, and of Section 18–4901, Idaho Code, and that Family Finance actively participated in the scheme.

Family Finance first assigns as error the trial court's finding that the referral sales scheme used herein was an illegal lottery. The trial court based its decision upon the decision of the Washington Supreme Court in the case of Sherwood & Roberts-Yakima, Inc. v. Leach, 67 Wash.2d 630, 409 P. 2d 160 (1965), wherein the Washington Court held on facts strikingly similar to those before the Court today that such a referral sales scheme was a lottery and therefore illegal. In interpreting their lottery statute, the Washington Court held that "chance within the lottery statute is one which dominates over skill or judgment." A number of other states have made similar rulings regarding chain referral sales schemes as we observed in Nab v.

Hills, 92 Idaho 877, 882, 452 P.2d 981 (1969). However, while no mention has been made by either the trial court or appellants before this Court, the application of the constitutional mandate against lotteries in Article 3, Section 20, Idaho Constitution, as applied to referral sales schemes is controlled by our own decision in Oneida County Fair Board v. Smylie, 86 Idaho 341, 386 P.2d 374 (1963), wherein this Court definitively passed on the issue of what constitutes a lottery and stated that for a scheme to be a lottery it must be "one solely based on chance." On a petition for rehearing in the *Oneida* case, this Court stated, at page 374, 386 P.2d at page 395:

> "*Respondent would have this Court adopt the rule that a determination as to whether a particular scheme of wagering constitutes a lottery, should be based on whether the element of skill predominates over the element of chance. It is our conclusion that the persuasive weight of authority rejects that rationale of decision.*
>
> "We have by the original opinion concluded that 'lottery' as used in our Constitution applies only to distributions of money or things of value by chance, and in which process of distribution the element of skill plays no part. *If skill plays any part in determining the distribution there is no lottery as prohibited by our Constitution.* In any particular game where skill is in fact an element, the questions of whether skill predominates over chance in determination of the result, and whether any game in which skill may or may not predominate is to be prohibited, must be decided by the legislature under its inherent and delegated powers as the law making body." 86 Idaho 341, at 374, 386 P.2d 374, at 395. (Emphasis added).

■ ■ If the average individual who walks in to a race track and, with or without reading the racing form, places a $2.00 bet on a horse is exercising skill and judgment which removes parimutuel horserac-

ing from the category of a lottery as the Court said in the *Oneida* case, then when that same individual leaves the race track and goes home and prepares his list of referrals to a Cen-States representative after exercising his judgment in considering those of his acquaintances who would be sufficiently interested in music to give serious consideration to purchasing one of the stereo sound systems in question, he is also exercising skill and judgment which would prevent that act from constituting participation in a lottery. At least it raises a sufficient factual issue on that point to prevent the granting of a summary judgment on the disputed evidence which we find in the record of this case. In addition, the skill and efforts of the salesman would certainly remove the scheme from the lottery category. In this regard we are not unmindful of the view of the Washington court in Roberts-Yakima v. Leach, *supra,* that the skill of the salesman is immaterial. However, in our opinion, such a rule could draw into the realm of lottery legitimate business transactions never intended to be within the scope of the constitutional prohibition. We are of the view that any skill or judgment practiced by a participant, or someone on his behalf, removes the enterprise from the category of lottery as prohibited by Article 3, Section 20, of the constitution. From the record before us it is apparent that skill and judgment are involved in the Cen-States sales referral scheme, and therefore it is not a lottery.

■ There is no doubt that the referral sales scheme practiced by Cen-States was an insidious plan; however, we note that as of March 30, 1971, chain referral schemes such as the one in the instant case would be consumer credit sales within the meaning of our Uniform Consumer Credit Code (U.C.C.C.), I.C. § 28–31–101 et seq. S.L.1971 Ch. 299. The U.C.C.C. expressly prohibits referral sales plans such as that employed in the instant case. Under the U.C.C.C., consumer credit agreements executed under such a plan are unenforceable and the consumer may at his option keep

any goods or services received under such a plan and lawfully refuse to pay for them. I.C. § 28–32–411. As a result there is no compelling reason for us to remold the law of lottery to fit the needs of this particular case. As we stated in the *Oneida County* case at page 374, 386 P.2d at page 395:

"In any particular game where skill is in fact an element, the questions of whether skill predominates over chance in determination of the result, and whether any game in which skill may or may not predominate is to be prohibited, *must be decided by the legislature under its inherent and delegated powers as the law making body*." 86 Idaho 341, at 374, 386 P.2d 374, at 395. (Emphasis added).

█ There is no necessity for this Court to fashion a new remedy when there are existing remedies available. The answer to the complaint in Case Number 23413, and the complaint of plaintiffs Braddock et al in Case Number 23457, while primarily alleging that the referral sales scheme is an illegal lottery and that Family Finance was a party to the illegal scheme, nevertheless also allege that the loan transaction with Family Finance was entered into as a result of fraudulent misrepresentations on behalf of both Cen-States and Family Finance. While the allegations concerning an illegal lottery are not appropriate as a result of the action which we have taken in this opinion, nevertheless the answer to the complaint of Family Finance in Case Number 23413, and the complaint of plaintiffs Braddock et al in Case Number 23457, allege or attempt to allege fraud on behalf of Family Finance. If proven the causes of action for fraud would adequately and perhaps better protect the rights of the purchasers, with the possibility for substantial punitive damages as pointed out by this Court in Jolley v. Puregro, 94 Idaho 702, 496 P.2d 939 (1972), rather than merely declaring the promotion to be a lottery, and as a result refusing to enforce the notes and leaving the parties where we found them.

The trial court granted summary judgment in favor of the purchasers, determining in effect as a matter of law that chance predominated over skill in this venture, following the doctrine of the Sherwood & Roberts-Yakima v. Leach case, *supra*. However, applying the test of lottery as set out in the *Oneida* case, i. e., whether or not the scheme was dependent "entirely on chance," we are of the opinion that as a matter of law skill and judgment were involved in this sales scheme and therefore it was not a lottery.

Summary judgment reversed. Costs to appellant.

DONALDSON, C. J., and McQUADE and McFADDEN, JJ., concur.

SHEPARD, Justice (dissenting).

Today this Court overturns the decision of the district court which found that chain referral sales schemes are illegal lotteries. That decision of the lower court was consistent with the unanimous suggestion of this Court in Nab v. Hills, 92 Idaho 877, 452 P.2d 981 (1969). Based on a profusion of authorities from all across the country we said in *Nab*:

"Before we discuss the assignments of error, *we must observe that the type of sales referral scheme which appellant attempted to prove at trial has been held by a number of jurisdictions to constitute an illegal lottery. Such 'illegal lotteries' are considered void as against public policy*. See, M. Lippincott Mortgage Investment Co. v. Childress, 204 So.2d 919 (Fla.Dist.Ct.App.1967); Commonwealth v. Allen, 404 S.W.2d 464 (Ky.1966); State by Lefkowitz v. ITM, Inc., 52 Misc.2d 39, 275 N.Y.S.2d 303 (Sup.Ct.1966); Sherwood & Roberts-Yakima, Inc. v. Leach, 67 Wash.2d 630, 409 P.2d 160, 14 A.L.R.3d 1411 (1965); cf., Idaho Const., art. 3, § 20; I.C. §§ 18–4901—18–4909; see generally, Annot., 14 A.L.R.3d 1420 (1967); Baird, Let the 'Seller' Beware—Another Approach to the Referral Sales Scheme, XXII U. Miami L.Rev. 861 (1968); Comment, Referral Sales Contracts: To Alter or Abolish?, 15 Buffalo L.Rev. 699 (1966);

Note, Criminal Aspects of Chain Referral Sales, II Suffolk U.L.Rev. 93 (1968). This court undoubtedly has the power to raise the questions of illegality and public policy *sua sponte*. See Stearns v. Williams, 72 Idaho 276, 240 P.2d 833 (1952). Nevertheless our resolution of the issues on appeal, *infra*, make it unnecessary to determine the legality of a chain referral sales contract." 92 Idaho at 882, 452 P.2d at 986 (Emphasis added)

Rather than implementing the suggestion of *Nab* the majority herein fastens upon language from Oneida County Fair Board v. Smylie, 86 Idaho 341, 386 P.2d 374 (1963). Obviously, *Oneida* preceded *Nab* by six years and, therefore, I believe *Nab* should control rather than *Oneida*.

In my judgment the majority opinion herein unnecessarily elevates *Oneida* and its definition of "lottery" to a position of controlling importance. In my opinion this is doubly unfortunate since "lottery" as defined by *Oneida* is so broad and elastic that the constitutional prohibition is emasculated. I believe that *Oneida* was an attempt to reconcile the constitutional prohibition against lotteries with the legislative desire to legitimatize horse racing. I would therefore suggest that the "rule" of *Oneida* best be confined in its application to the special facts of that case.

In *Oneida* the majority opinion suggested that the decisions of sister states should be examined to discover the best reasoned approach to a definition of lottery. Among the cases examined were: Utah State Fair Ass'n v. Green, 68 Utah 251, 249 P. 1016, 1022 (1926); Multnomah County Fair Ass'n v. Langley, 140 Or. 172, 13 P.2d 354, 356 (1932); Engle v. State, 53 Ariz. 458, 90 P.2d 988, 993 (1939), *followed in* Boies v. Bartell, 82 Ariz. 217, 310 P.2d 834, 837 (1957); Longstreth v. Cook, 215 Ark. 72, 220 S.W.2d 433, 437 (1949); Ginsberg v. Centennial Turf Club, 126 Colo. 536, 251 P.2d 926, 929 (1952). *See:* II Suffolk L.Rev. 93, 100 (1968). Those cases suggest a definition of lottery as one in which chance dominates over skill or

judgment. Unfortunately that did not deter the majority in *Oneida* from finding "if skill plays *any* part in determining the distribution there is no lottery as prohibited by our Constitution." 86 Idaho at 374, 386 P.2d at 395 (emphasis supplied).

Assuming, *arguendo,* that the *Oneida* "solely based on chance" test should be extended to enterprizes other than horse racing it is clear to me at least that the scheme devised in the instant case provided no opportunity for the exercise of skill. As stated in Sherwood & Roberts-Yakima, Inc. v. Leach, 67 Wash.2d 630, 409 P.2d 160 (1965)

"* * * Assuming that respondents in fact used skill or judgment in selecting the referrals, the trial court properly held that chance permeates the entire scheme. The court found that respondents took a chance that the referrals might not be interested; that the salesman might not adequately make his presentation; that the referral might have already been referred by someone else; that the market might be saturated; and that the salesman might not even contact the referral. In addition, the trial court noted that respondents have no control over the general operation after they gave the names of referrals. In fact, respondents were told not to contact the referrals before the Lifetone salesman made his presentation, and respondents were told to emphasize the money-making program in case the referrals contacted them." 409 P.2d at p. 163.

The element of chance which permeated Sease's scheme in the instant case is heightened by its so-called chain-letter effect. Coincidentally, the factual discussion in *Sherwood & Roberts* applies precisely to Sease's "allotment privilege" and its chain-letter effect:

"* * * For ease of demonstration, respondents must earn 12 commissions of $100 each in order to get, as promised, something for nothing. This means that 12 of respondents' referrals must pur-

chase as respondents did; they, in turn, to get something for nothing, must find 12 more people to purchase, and so forth, as follows:

|  | Number of Purchasers |
|---|---|
|  | 1 |
| 1st round | 12 |
| 2d round | 144 |
| 3d round | 1,728 |
| 4th round | 20,736 |
| 5th round | 248,832 |

"Soon the scheme will run itself out; the market will become saturated." Sherwood & Roberts-Yakima, Inc. v. Leach, *supra*, 409 P.2d at 163.

I would take judicial notice that in 1968 the population of Coeur d'Alene, Idaho was less than 20,000 people. If every man, woman, and child in Coeur d'Alene bought a stereo set, the allotment privilege had to play itself out and the market become completely saturated between the third and fourth round. The inherent fallacies and dangers of such sales referral schemes are aptly stated:

"[t]he inherent fallacy of all referral contracts [is] the 'chain letter effect.' Any given single buyer may get the benefit of his agreement, if none of the foregoing defects arise. And if the referral payment could be earned simply by providing a name at random, regardless of the potential customer's financial condition or his ownership of the item or need for the service in question, all buyers could satisfy their obligation; the telephone directory would assure that. But the seller could ill afford such an arrangement. The seller will therefore restrict the buyers in providing names: to earn a payment the buyer must provide the name of a person who actually buys the product or service, or at least one who could afford it, who is presently without it, and who has not been referred. The seller must thus insure himself a chance to convert names into sales to stay in business.

*"This restriction means that no matter how large the financial resources or how pure the methods of the seller, the success of the buyers as a group depends on an inexhaustible supply of bona fide potential customers. Whatever the number of referrals required of each buyer to avail himself of the full benefits, there cannot be enough remaining potential customers to prolong the chain indefinitely.* The early and rapid success of the plan (should such occur) only hastens its end, as far as the buyers are concerned. The last buyers in any given market, whether because of the seller's failure or the exhaustion of potential customers, must pay for whatever benefit their predecessors received, without themselves benefiting at all. This feature is built into most of the plans—thus if the seller can hold on long enough to exhaust the market, he will ultimately make enormous profits from the last round of buyers. And the buyer who is unaware of the history, in his area, of the particular plan offered him is at a considerable disadvantage." (Emphasis supplied) Comment, Referral Sales Contracts: To Alter or Abolish, 15 Buffalo L.Rev. 669, 684–685 (1966).

Thus even under the *Oneida* rule I would conclude that the referral sales scheme in the instant case was in fact an illegal lottery because skill plays no part in determining whether the participants gain any reward from the scheme.

In my judgment there is no genuine issue of material fact in the instant case. Sease's referral sales scheme contained the requisite elements of chance, consideration and prize and in my opinion is clearly an illegal lottery. Sherwood & Roberts-Yakima v. Leach, *supra*; See also: State by Lefkowitz v. ITM, Inc., 52 Misc.2d 39, 275 N.Y.S.2d 303 (1966); Commonwealth v. Allen, 404 S.W.2d 464 (Ky.1966); M. Lippincott Mortgage Investment Co. v. Childress, 204 So.2d 919 (Fla.App.1967).

The judgment of the district court should be affirmed.